**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Superior Wilderness Action Network and Heartwood,

Plaintiffs,

v.

United States Forest Service, James Sanders, Forest Supervisor, Bruce Slover, District Ranger, and Robert Jacobs, Regional Forester,

Defendants,

and,

North Shore Forest Products, Inc., and Minnesota Timber Producers Association,

Intervenors.

Civil File No. 01-29 (MJD/RLE)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on the parties' cross-motions for summary judgment. Intervenors join in Defendants' motion for summary judgment. For the following reasons, the Court grants Defendants' motion and denies Plaintiffs' motion.

## BACKGROUND

Plaintiffs Superior Wilderness Action and Heartwood ("Plaintiffs") challenge the United States Forest Service's decision to undertake forest management activities in the Rocky Road Project Area ("Rocky Road") of the Superior National Forest. Specifically, Plaintiffs challenge the Forest Service's implementation of a logging plan in the Kawishiwi District in northeastern Minnesota. In sum, Plaintiffs assert that the Environmental

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD 3 1 2002
DEPUTY CLERK

Assessment ("EA") performed in connection with the Forest Service's decision is not sufficient to support the Decision Note ("DN") and the Finding of No Significant Impact ("FONSI"). Plaintiffs have filed the underlying lawsuit against Defendants United States Forest Service, James Sanders, Forest Supervisor, Bruce Slover, District Ranger, and Robert Jacobs, Regional Forester ("Defendants") for alleged violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.

The Superior National Forest spans 2.1 million acres and consists of conifer (pine, spruce, and balsam fir) and deciduous (aspen, birch, and maple) tree species. The Land and Resource Management Plan ("LRMP") outlines long range goals and objectives for the Superior National Forest. The Rocky Road Project Area is located within the Superior National Forest in the Kawishiwi Ranger District of northeastern Minnesota in Management Area 1.4. According to the LRMP, the objectives for this area include to increase the presence of long-lived forest types including conifers; to produce forests with a variety of age classes; to increase structural diversity and improve wildlife habitat for moose and grouse by providing more young forests; to manage timber resource to maintain productive stands; to supply raw wood products for the local timber-based economy; and to reduce natural fuel loads in selected areas. AR, Vol. 1, Book 2, Tab III, p. 1-1, 1-2. The Forest Service sought public comment on its Rocky Road Project proposal, and developed issues for analysis and alternatives for action. Then, on May 25, 2000, the Forest Service issued an Environmental

Analysis ("EA").

The EA outlines the review process. The Forest Service formed an interdisciplinary team of specialists in forestry, biology, engineering, fire management, soils, recreation, wilderness, history, timber, wildlife and other specialties to identify and study the issues presented by the proposed actions. The interdisciplinary team solicited and evaluated public comment. Plaintiffs participated in the public comment and submitted a proposal. Then, the interdisciplinary team analyzed the three proposals before it, including Plaintiffs' proposal.

After this review, the District Ranger ("DR") of the Kawishiwi District issued a Decision Notice ("DN"). First, the DR decided to implement the second of the three alternatives. This alternative includes (1) harvesting approximately 1,205 acres by the "clearcut with reserve" method which results in harvesting only specific tree species, by thinning or by a combination of these methods; (2) regenerating and converting 351 harvested acres to longer-lived tree species; (3) planting 82 acres of trees for greater species diversity; (4) naturally regenerating 693 acres; (5) releasing all planted areas at least twice in five years after planting to ensure adequate survival; (6) constructing 3.6 miles of temporary use roads and reopening 11.6 miles of closed roadbeds; and (7) reducing fuel loads by the use of fire in approximately 364 acres. DN, AR at Vol.1, Book 2, V.B.

Second, the DR established mitigation measures, which include minimizing visual impact; closing of temporary roads after logging operations; limiting harvest in certain areas and at certain times to protect soil productivity, wildlife, and water quality; working with the

U.S. Fish and Wildlife Service; and monitoring of harvest areas, plantings, wildlife, and road closures. Id. at 2-7.

Third, the DR, determining that the Rocky Road Project did not constitute a major federal action that will significantly impact the quality of the human environment, issued a Finding of No Significant Impact ("FONSI"). The DR determined that there was no significant irreversible loss of wildlife habitat, soil productivity, water quality or timber resources, no significant unique forest features, no significant adverse effects on the environment, no significant cumulative effects with other projects and no negative impacts on threatened or endangered species. Id. at 9-10. Accordingly, the DR concluded that preparation of an Environmental Impact Statement ("EIS") was not necessary before proceeding with the project. Plaintiff Heartwood appealed that decision on August 28, 2000. The Appeal Deciding Officer affirmed the DR's decision and finding of no significant impact on October 13, 2000. Thereafter, Plaintiffs filed the underlying lawsuit. Because there are no disputed issues of material fact in this case, the parties filed cross-motions for summary judgment.

**DISCUSSION**

**A. Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980

F.2d 1217, 1219-20 (8th Cir. 1992). As the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quotation omitted).

**B. Statutory Framework**

The National Forest Management Act ("NFMA") governs the United States Forest Service's management of the national forests and requires that the Forest Service prepare land and resource management plans for the national forests. 16 U.S.C. §§ 1604-14. The Forest Plans must provide for multiple use and sustained yield of the products and services obtained from national forests and, "in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The Multiple-Use Sustained Yield Act of 1960 requires the Forest Service to manage for uses including outdoor recreation, range, timber, watershed, and wildlife and fish purposes. 16 U.S.C. § 528.

The Forest Service must prepare its land and resource management plans in accordance with the National Environmental Policy Act ("NEPA"). See 16 U.S.C. § 1604(g)(1). The NEPA ensures that "government agencies act on full information and that interested groups have access to such information." Sierra Club v. U.S. Forest Serv., 46 F.3d 835, 837 n. 2 (8th Cir. 1995). The NEPA requires federal agencies to include an

Environmental Impact Statement ("EIS") in every report on proposals for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Forest Service prepares an EIS for each national forest as part of the Forest Plan required by the NFMA. Sharps v. U.S. Forest Serv., 823 F. Supp. 668, 675 (D.S.D. 1993). For subsequent site-specific projects, however, an EIS is required only if the project will significantly affect the environment. Sharps v. U.S. Forest Serv., 28 F.3d 851, 852 n. 2 (8th Cir. 1994); 40 C.F.R. § 1501.4. Accordingly, an agency may prepare an Environmental Assessment ("EA") to determine whether the impact of a proposed project rises to the level of a major federal action and an EIS is necessary. 40 C.F.R. §§ 1501.4 and 1508.9.

An EA is a concise public document that briefly discusses the issues relevant to a proposed project. Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 12 (2d Cir.1997); 40 C.F.R. § 1508.9. The EA either concludes that preparation of an EIS is necessary or issues a finding of no significant impact, in which case preparation of an EIS is not necessary. Id. The EA should provide sufficient evidence and analysis for making that determination. 40 C.F.R. § 1508.9(a)(1). The EA must include brief discussions of the need for the proposal, of alternatives, and of the environmental impacts of the proposed action and the alternatives. 40 C.F.R. § 1508.9(b). When evaluating the significance of a proposed federal action, an agency should consider the impact in several contexts and should measure the intensity, or severity, of the impact by considering:

> impacts that may be both beneficial and adverse; ... the degree to which the proposed action affects public health or safety; ... unique characteristics of the geographic area, ... the degree to which the effects on the quality of the human environment are likely to be highly controversial; ... the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; ... the degree to which the action may establish a precedent for future actions with significant effects; ... whether the action is related to other actions with individually or cumulatively significant impacts; ... the degree to which the action may adversely affect an endangered or threatened species or its habitat.

40 C.F.R. § 1508.27.

**C. Scope of Review**

In this case, Plaintiffs assert their claims under NFMA and NEPA. Because these statutes provide no provisions for judicial review, Plaintiff's claims must be asserted pursuant to the Administrative Procedure Act ("APA"). A reviewing court may hold unlawful and set aside agency action only if it is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This standard of review gives agency decisions a "high degree of deference." Sierra Club v. Envtl. Prot. Agency, 252 F.3d 943, 947 (8th Cir. 2001) (citation omitted).

**D. Failure to consider "significant factors"**

Plaintiff asserts that the Forest Service violated NEPA when it failed to analyze the presence of certain significant factors before issuing the DN and FONSI. An agency must take a "hard look" at the consequences of a proposed action. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 374 (1989). In this case, Plaintiffs assert that the Forest Service

failed to take the requisite "hard look" because it did not consider five of the ten factors of significance set forth in the NEPA regulations outlined above. Plaintiffs assert that the Forest Service failed to consider (1) beneficial and adverse impacts; (2) controversial aspects of the project; (3) cumulative impacts; (4) effect of the action with respect to future actions; and (5) the impact on threatened and endangered species.

The Court disagrees. The EA includes a detailed discussion of the impacts of the project on many resources, including timber, visual quality, private property, recreation and tourism, roads, fire management, soils, threatened endangered and sensitive species, wildlife and fisheries management, water quality, wetlands, flood plains and prime farm lands, air quality, heritage resources, economics, old growth forest, and forest fragmentation. (EA, Vol. 1, Book 2, Tab III, pp. 3-2 to 3-35. The EA discusses each of these issues and the impact of each of the three alternative proposals. (Id.) The discussion is further supported by additional documentation in the appendices and supplements. (Id. at Tab IV, A-E.) The EA also discusses the effects of past and reasonably discernable future activities. (EA, Vol. 1, Book 2, Tab III, pp. 3-2, 3-4, 3-24, 3-25, 3-27, 3-29 and App. F and G.) The Court cannot conclude that the Forest Service's analysis of the significance factors was arbitrary or capricious or that it failed to take the requisite "hard look."

**E. Failure to Monitor and Provide Adequate Mitigation Measures**

Plaintiffs argue that the Rocky Road project violates NEPA because the Forest Service proposes to implement inadequate mitigation measures. First, Plaintiffs assert that there are

no site-specific mitigation measures to address the size of the harvest area. (Pl. Mem. at 14.) Plaintiffs argue that cutting 1,205 acres within Management Area 1.4 would exceed the average annual cut proposed in the LRMP. However, as Intervenors argue, the schedule of timber harvests is to be updated annually and the schedule may be modified as conditions change in the forest. LRMP, p. B-1. In this case, the EA identified the conditions of this forest. Most of the area to be harvested consists of old, decaying aspen susceptible to insects and disease such as white trunk rot. Currently, according to the EA, these trees pose a risk of fire to the forest, wildlife, and surrounding homes. Additionally, the presence of the older trees impedes the growth of a healthy, young age class forest habitat. Also, according to the EA, the white spruce and balsam fir in this forest are susceptible to the deadly spruce bud worm. Currently, there is heavy spruce budworm damage in the Rocky Road Project area, which may spread if not addressed. The presence of the disease renders the forest susceptible to large, destructive wildland fires. Part of the stated objective of the Rocky Road Project and the proposed timber harvest is to reduce fuel loads and increase the young age class forest habitat.

Contrary to Plaintiffs' argument, the EA identifies specific mitigation measure for the proposed timber harvest. The EA identifies mitigation measures on over forty Units, to include tree-marking, leaving a specified acreage of trees, designing harvested areas so that they are minimally visible from the road, replanting or converting to other tree species, removing fuel concentrations around longer lived trees, and minimizing the effects of

temporary roads. EA, Vol. 1, Book 2, Tab III, pp. 2-3 to 2-4.

Plaintiffs next argue that no specific mitigation measure exists to address soil impact. However, the EA discusses mitigation measures with respect to the soil, including removing the nutrient-rich tops and branches of trees and redistributing them on certain land types to return nutrients to the soil; locating roads, landings, and skid trails to minimize soil impacts; and halting harvesting activities during periods of high-soil moisture. Id. at 2-4. Certain units would be harvested only in frozen ground conditions to lessen impacts on the soil or wetlands. Id. at 2-6. The EA discusses methods to be used to minimize erosion and reduce nutrient depletion. Id. at 3-18 to 3-19. Plaintiffs take issue with the EA's statement that "[i]n addition the long rotation period, 50 to 100 years, before these sites would be harvested ensures that there would not be a significant nutrient drain on these sites." Id. at 3-19. Plaintiffs assert that such a statement does not constitute "mitigation." Nevertheless, that statement, taken together with the other discussion of soil mitigation measures, is sufficient to satisfy the requisite "hard look" standard.

Finally, Plaintiffs argue that no site specific mitigation measures exist to address wildlife, particularly bird species. Defendants and Intervenors assert that the mitigation measures outlined are based on the best available data and the data necessary to complete the EA. Wildlife mitigation measures are discussed for four specific units of boreal owl nesting habitat. Id. at 2-5. According to the EA, dead trees would be left standing to provide habitat for wildlife. Id. Large trees with cavities or large stick nests would not be cut. Id. Buffer

zones spanning two-hundred feet would be located around lakes, rivers, and streams affecting fourteen Units. Id. From May 1 through August 15, harvesting would not be permitted in specified Units, to protect nesting pine warbler habitat. Id. Finally, the mitigation measures set forth in the standards and guidelines of the LRMP, the riparian management reference for National Forests of Minnesota, the Forest Management Guidelines, Best Management Practices in Minnesota for Water Quality, and Best Management Practices for Visual Quality, would be implemented. Vol. 1, Book 2, Tab V, DN/FONSI at 2. The Court concludes that there is sufficient data and support for issuing the DN and FONSI, and that the Forest Service's decision cannot be characterized as arbitrary or capricious.

**F. Failure to Consider Cumulative Impacts**

Plaintiffs claim that the Forest Service failed to consider cumulative impacts. However, the project discusses cumulative impacts at length and expanded its analysis to include the entire Stony Baird area. Id. at Tab III at 3-1 and A-1. This discussion includes an analysis of nineteen critical issues with references to additional documents located in the appendices. Id. at 3-1 to 3-5. Contrary to Plaintiffs' argument otherwise, the Forest Service also considered the impact on property values in the project area. Id. at 3-12. Ultimately, the Court cannot conclude that the Forest Service's decision in this matter was arbitrary or capricious.

**G. Violation of NFMA**

Third, Plaintiffs challenge the Rocky Road Project because, they argue, (1) the EA

failed to provide adequate monitoring and analysis of the population data for Management Indicator Species, sensitive species, and listed species; (2) the project threatens the viability of wildlife and certain Management Indicator Species; and (3) the substance of the DN and FONSI lack adequate monitoring and population data. Citing 36 C.F.R. Part 219, Plaintiffs contend that federal regulations require the Forest Service to conduct site-specific monitoring of the viability of management indicator species in the Rocky Road project. (Pl. Mem. at 26.) However, Part 219 applies to the National Forest System Planning and does not govern individual project decisions such as the Rocky Road Project. Sharps, 28 F.3d at 854.

Additionally, the Forest Service explains its analysis of management indicator species. Vol. 1, Book 2, Tab III, at 3-25 and App. H-J. Documentation exists concerning research and surveys, which include forest-wide monitoring reports that discuss habitat and population trends. Vol. IV, Book 1, Tab VIII, A-D. A biological evaluation is included. Vol. 1, Book 2, Tab IV, A. Further, a discussion of threatened and endangered species and wildlife impacts exists. Vol. 1, Book 2, Tab III at 3-21 to 3-26. The Court concludes that the Forest Service's decision was supported by sufficient data, was not arbitrary and capricious, and complied with NFMA requirements.

**CONCLUSION**

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment (Clerk Doc. No. 20) is **DENIED**;

and

2. Defendants' Motion for Summary Judgment (Clerk Doc. No. 18) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: 1-30, 2002

Michael J. Davis
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.